Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### AT HUNTINGTON

| | |
|---|---|
| IN RE: | CASE NO. 3:16-bk-30247 |
| SABBATICAL, INC., | CHAPTER 11 |
| Debtor. | JUDGE FRANK W. VOLK |

### MEMORANDUM OPINION AND ORDER

Pending are (1) the United States Trustee's Motion to Appoint Chapter 11 Trustee (doc. 59), (2) Interested Party People's Bank's Motion to Appoint a Trustee (doc. 52), and (3) Debtor Sabbatical, Inc.'s ("Sabbatical") Motion to Dismiss (doc. 35).

The Court held an evidentiary hearing on the motions on November 16 and 18, 2016, during which it heard testimony and arguments from the parties. Afterwards, the Court entered a briefing order, requiring the parties to order a transcript and file proposed findings of fact and conclusions of law. Inasmuch as the parties tendered their final filing on January 10, 2017, the matter is ready for adjudication.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. The Court first addresses the United States Trustee's Motion to Appoint a Chapter 11 Trustee.

# I.

### A.    Facts and Procedural History

Sabbatical filed its voluntary Chapter 11 Petition on May 18, 2016.  Sabbatical's President is Dennis Ray Johnson, II.  Sabbatical operates as part of a coal enterprise, along with several related business entities with which Mr. Johnson is affiliated.  These other entities are likewise in bankruptcy, having either been the subject of a voluntarily petition or targeted for involuntary relief by affected creditors.  Mr. Johnson also filed a Chapter 11 petition on May 9, 2016.  Mr. Johnson's individual case, along with the coal enterprise cases, are jointly administered.  Chapter 11 Trustee Thomas Fluharty was appointed to steer their course.

Sabbatical is the holding and operating company for American Coal Terminal, which is the owner of the Lockwood Dock.  Transcript 32:23 – 24.  The Lockwood Dock is a transloading dock facility along the Big Sandy River.  Mr. Johnson purchased the Lockwood Dock from Arch Coal on December 22, 2014.  Transcript 60:12 – 17.  The purchase was at least partially funded by Producers Coal, Inc., an entity that is part of the coal enterprise.  Sabbatical was formed in that same month to act as the holding company for the Lockwood Dock.  Transcript 60:21 – 24.  At that time, Mr. Johnson was Sabbatical's sole shareholder.  *Id.*   Mr. Johnson transferred his entire interest in Sabbatical to the Denise Johnson Real Estate Trust (the "Trust") in March of 2015.  Transcript 60:25 – 61:9.

Prior to filing, Sabbatical, along with other related coal enterprise entities, had been involved in state court litigation in Cabell County.  On April 29, 2016, the Circuit Court held an evidentiary hearing and orally appointed a special receiver for Sabbatical, as well as several other entities. Transcript 83:8. The United States Trustee asserts that Sabbatical's Chapter 11 filing was

2

accomplished to frustrate the receiver appointment.  Mr. Johnson appeared to corroborate that conclusion with his testimony that "[his] attorneys were confused as to [whether] it was a receiver over everything, over me, over what.  So when we left the courtroom, my attorneys told me . . . that I had to file bankruptcy immediately.  And they recommended that I file bankruptcy on Sabbatical . . . ."  Transcript 83:22 – 84:9.

In May 2016, however, the Circuit Court entered an order that omitted both Sabbatical and the Trust from receivership coverage.  Six weeks later, on July 1, 2016, Sabbatical moved to voluntarily dismiss its petition.  Sabbatical asserts that the case no longer satisfies a bankruptcy purpose and its creditors would be better served if the case were dismissed, especially since it could continue to pay its creditors' claims as they came due.  Motion to Dismiss, par. 12, Transcript 36:21 – 37:20.

## 1.  Ownership and Control of the Debtor

In March 2015, a little over a year prior to his own personal filing, Mr. Johnson transferred his 100% interest in Sabbatical to the Trust.  Transcript 60:25 – 61:9.  Around the same time as this transfer, Mr. Johnson testified, the other docks that he owned were losing money and were, in fact, "getting killed."  Transcript 80:1 – 13.  He further testified that he had always looked at trusts as "asset protection on estate planning," and he went through with the Trust transaction on his daughter's sixteenth birthday, just weeks before the Circuit Court announced its intention to appoint a receiver.  Transcript 82:20 – 83:7.

Denise Johnson, Mr. Johnson's wife and the Trust's sole trustee, testified at the November 2016 hearing that (1) she named her husband and P.J. Ball as the Sabbatical corporate officer, (2) she was not responsible for making day-to-day decisions, (3) she had no prior

3

experience in the coal industry, (4) she never signed any business agreements on behalf of Sabbatical or its wholly-owned subsidiary, and (5) she was generally unfamiliar with the layout of the facility and details of its operation.  Transcript 200:12 – 201:23, 202:15 – 203:22, 202:9 – 14, 204:25 – 205:18, 203:25 – 204.  In fact, the dock manager for Sabbatical, Dewey Webb, testified that he received his instructions from Mr. Johnson and that he believed that Mr. Johnson was the owner of Sabbatical.  Transcript 211:14 – 16, 229:18 – 19.  Mr. Johnson held himself out to be the controller of the Lockwood Dock, per an email he sent to his frequent business colleague, Carbon Partners, in which he said, "I wanted to reassure you that I control 100 percent of Lockwood Dock."  Transcript 139:25 – 140:4.

Also transferred to the Trust around the same time was Mr. Johnson's personal residence, although he did not testify to that at the November hearing.  Transcript 197:12 – 14. Additionally, in March 2015, Mr. Johnson transferred almost all of his real estate holding company interests to the Dennis Johnson Irrevocable Children's Trust.

## 2. Intercompany Monetary Transfers

Mr. Johnson testified in the November 2016 hearing that he regularly directed intercompany transfers and loans between various coal enterprise entities.  Transcript 172:25 – 173:13, 175:10 – 175:8.  For example, Kentucky Fuel Corporation was required to pay Producers Coal, Inc. (part of the coal enterprise and owned 50% by Mr. Johnson), $2,000,000 pursuant to a settlement. This accord is memorialized in a letter agreement dated April 6, 2015.[1]  Transcript 107: 24 – 108:16, 115:13 – 17.  According to email correspondence between Mr. Johnson and a

---

[1] Although Mr. Johnson testified that he was simply the Secretary of Producers Coal at the time, the document indicates that he signed on behalf of the company as the President.  Transcript 105:14 – 106:4.

representative of Kentucky Fuel, however, Mr. Johnson instructed the check be made out to Moussie Processing instead.  Transcript 107:5 – 108:16.  It is important to note that People's Bank had a lien on most the accounts of Producers Coal as of October 16, 2013.  Transcript, 108:17 – 20.

As of November 16, 2016, $1,150,000 had been paid by Kentucky Fuel to Moussie, of which $50,000 was received and deposited *post-petition* by Moussie.  Transcript 109:15 – 17.  Of that $50,000, half was used as a loan to provide capital to DJWV2, LLC, Little Kentucky Elk, LLC, and Elkview Reclamation and Processing (other coal enterprise entities).  Mr. Johnson testified that none of the $50,000 was loaned to other companies owned by Dennis Johnson.  Transcript 110:4 – 6.  A review of pertinent financial documents shows, however, these monetary transfers from Moussie to the above-listed companies.  Transcript 111:1 – 25.  Mr. Johnson attempted to clarify his statements at the November 2016 hearing, explaining that Moussie owned the three companies to which "loans" were provided.  Transcript 112:1 – 9.  Prior authorization for this money shuffling was neither requested nor obtained from the Court.

Additionally, of the $1,150,000 paid to Moussie, $620,000 was eventually deposited into Mr. Johnson's personal account.  Transcript 113:19 – 24.  Of that, Mr. Johnson claimed that $350,000 was loaned to other companies.  Transcript 115:21 – 22.  Moussie also "loaned" $189,000 to Producers Coal, and $50,000 was provided to Sabbatical, ostensibly as a "loan," also coming through Mr. Johnson's personal account.  Transcript 113:12 – 24, 121:9 – 122:10; People's Bank Exh. 44.  The payment to Producers Coal was structured by Mr. Johnson as a loan, even though the letter agreement said it was simply payable to Producers Coal.  Transcript 115:13 – 116:18.  The money paid to Mr. Johnson, he alleged at the hearing, was "a repayment" for all the money he had been putting into the company or companies over time.

Transcript 114: 1 – 19.  And the influx of cash to Sabbatical, Mr. Johnson testified, was some combination of "owner equity" and money to cover payroll, although his explanation proved thoroughly indecipherable.  Transcript 124:11 – 22.

Another example of these intercompany transfers were two debits taken from Mr. Johnson's personal account for $150,000 and $100,000 respectively, which were deposited with Sabbatical.  Transcript 119:10 – 17.  Mr. Johnson characterized those as "short-term loans" that were paid back by Sabbatical.  Transcript 120:9 – 10.

Mr. Johnson also testified that he generally would take money from various real estate venture accounts and lines of credit, deposit those monies into his personal account, and then loan those funds out to various companies within the coal enterprise.  Transcript 120:13 – 23. He further stated that it was "general practice as needed to make loans and get the loan repayments . . .".  Transcript 121:1 – 6.  The Court notes that Mr. Johnson testified as to the recording of all these transfers -- P.J. Ball "documented everything on intercompany transfers," and all of the companies had a separate set of books.[2]  Transcript 173:6 – 18.  He additionally testified to his belief that all the intercompany transfers were valuable to the enterprise.  Transcript 177:15 – 20.

Mr. Pinson also testified at the November 2016 hearing.  He owns half of both Redbud Dock and Producers Coal with Mr. Johnson, and was an active owner in both of those businesses.  Transcript 240:14 – 22, 240:23 – 241:7.  Mr. Pinson explained during his testimony that he did not make an investment in either company. Mr. Johnson initially funded the businesses, but Mr. Pinson guaranteed indebtedness to People's Bank later in the relationship.  Transcript

---

[2] Once Mr. Ball was hired, he became CFO for all of the coal enterprise entities, including Sabbatical, regardless of Mr. Johnson's claims that he attempted to keep Sabbatical separate from the other companies.  Transcript 397:18 – 22.  Neither Mr. Ball nor Mr. Johnson have provided "due to/due from" forms to Mark Pinson, Mr. Johnson's business partner, nor have they been provided to the Court.  Transcript 255:16 – 257:17.

276:1 – 4, 287:20 – 25.  Through this business arrangement, Mr. Pinson claimed that he became involved with various other coal enterprise companies and, at one point, was handling the financial aspects of all the coal enterprise companies until P.J. Ball was hired in 2013.  Transcript 248:16 – 249:11, 249:2 – 21.  Mr. Pinson confirmed Mr. Johnson's testimony that "transfers [were] going on between the companies all the time" and that money from the Producers Coal line of credit would go "where it needed to be."  Transcript 250:14 – 24. Those intercompany transfers eventually began to subsidize Mr. Johnson's efforts to start new coal production in 2013 and 2014. Transcript 251:3 – 25.

Mr. Pinson explained that he became concerned with the relentless transfers because the $12.5 million credit line with People's Bank had been maxed out, the coal enterprises were losing money, and the transfers were leaving Producers Coal saddled with unsatisfied repayment obligations.  Transcript 253:14 – 254:20.  This may, in part, explain why Mr. Pinson supports the appointment of a Chapter 11 Trustee in this matter.  Transcript 274:22 – 275:4.

### 3. Equipment and Inventory Transfers

On August 18, 2016, confusion arose concerning the location and ownership of a CAT Loader and a CAT Excavator.  Transcript 88:14 – 89:6.  Originally purchased by Redbud Dock, LLC, the equipment was transferred to the Lockwood Dock, then to Mr. Johnson's personal residence, and then back to the Lockwood Dock in October of 2016.  Transcript 217:13 – 218:16; 232:20 – 233:1.  Sabbatical, for unknown reasons, received and paid the invoices for those moves and for other equipment moved from the Stonecoal Mine, which is operated by Producers Coal. Transcript 217:13 – 218:6, 218:7 – 219:1, 222:8 – 223:24.

To explain the transfer of the CAT equipment, Mr. Johnson testified that he personally purchased the items in early 2016 from Redbud Dock because it needed money. Transcript 89:10 – 16.  The Court notes that Mr. Johnson represented interests on both the seller and purchaser side of the alleged transaction.  *Id.*  Mr. Johnson obtained a loan for $40,000 from First Sentry Bank on the CAT equipment, First Sentry Bank took a security interest in the equipment via a UCC filing, and Mr. Johnson deposited that $40,000 in the Redbud Dock account to fund business expenses.  Transcript 90:12 – 91:14.  From there, $11,000 was sent to another company, Appalachian Mining Reclamation, for repayment of an unknown obligation.  Transcript 96:5 – 9.

Importantly, the equipment previously had a blanket lien in favor of People's Bank.  Transcript 90:2 – 8.  Mr. Johnson felt that the security agreement with People's Bank contained a clause that allowed Redbud Dock to buy or sell equipment without written permission from the Bank. That assertion is sharply contested by People's Bank.  Transcript 90:2 – 11.  Also problematic is the fact that a forbearance agreement involving Mr. Johnson and Redbud Dock had been in place since June 30, 2015, which prohibited the sale or disposal of any collateral without prior written consent of the lender.  Transcript 93:2 – 94:8.  Mr. Johnson attempted to explain that he understood the forbearance agreement to simply supplement the loan agreements, rather than supplant them.  Transcript 95:9 – 17.  This explanation is not credible. That is especially so given that Mr. Pinson, 50% owner of Redbud Dock, neither approved, nor even knew until months later, of the equipment sale.  Transcript 259:22 – 260:25.

The two CAT pieces were not the only equipment moved to the Lockwood Dock despite being owned by Redbud Dock.  Mr. Pinson testified that at least eight other items were moved.  Transcript 261:1 – 19.  Moreover, the Lockwood Dock is currently using some of this

equipment, as well as 400 tons of rock owned by Redbud Dock, without compensating the latter or paying rental expenses.  Transcript 261:20 – 262:19, Debtor's Operating Reports & Schedules.

### 4.  Other Post-Petition Transfers

Mr. Johnson moved not only equipment but also coal stock.  The day after the state court receiver was appointed, and the day after Sabbatical filed for bankruptcy, Mr. Johnson sent an email to Carbon Partners instructing it to sell 5,300 tons of coal from the Logan Mine (which is part of the coal enterprise, owned by Producers Coal and operated by Appalachian Mining and Reclamation).  Transcript 133:3 – 11.  The coal was worth $662,500.  Transcript 138:15 – 16.  Mr. Johnson testified that he sold this coal through Sabbatical to benefit the coal enterprise, generally.[3] *Id.*; Transcript 138:1 – 20.  The transaction does not appear in the monthly operating reports and was not otherwise disclosed to the Court.

### 5.  Coal Enterprise Solvency

On April 27, 2015, Southern Marine Terminal, LLC, entered a five-year right of first refusal contract with Carbon Partners estimated to be worth at least $19,000,000 in 2016.  Transcript 125:11 – 126:16, 126:23 – 127:14.  Mr. Johnson surmised it was the most valuable asset in the coal enterprise.  Transcript 140:24 – 141:4.  Through this agreement with Carbon Partners, the Lockwood Dock was also able to guarantee itself an economic benefit, even while Mr. Johnson was terminating or releasing all of his other dock leases and was aware that his other coal enterprise

---

[3] Mr. Johnson spent many minutes trying to clarify the relationship between Sabbatical and Southern Marine Terminal regarding this coal and the sale to Carbon Partners.  This attempted explanation was essentially inscrutable, even with the aid of the transcript.  Transcript 134:9 - 137–22.

companies were fiscally impaired.   Transcript 69:13 – 72:10, 264:13 – 265:2, 267:2 – 271:1.

According to an agreement entered November 1, 2015, Carbon Partners agreed to pay for the

installation of a concrete pad at the Lockwood Dock, after which it would perform all coal loading

services there, regardless of whether Southern Marine Terminal exercised its right of first refusal

under their agreement.  Transcript 130:2 – 131:13.

One other consideration is important.  At some point, Mr. Pinson asked Mr. Johnson

for permission to discuss the coal enterprise's financial issues with People's Bank. Mr. Johnson

responded by threatening to "kick his teeth down his throat."  Transcript 273:3 – 21.

### 6.  Current Status of the Debtor and Coal Enterprise Purchase Offer

Mr. Pinson testified that the inclusion of Sabbatical in any sale of the coal enterprise

makes it "much more attractive" to potential buyers.  Transcript 300:12 – 15.  Mr. Fluharty, the

Chapter 11 Trustee for the jointly administered cases, has apparently received a written, non-

binding offer for the purchase of the coal enterprise.  The Lockwood Dock, and thus Sabbatical, is

essential to that offer.  Transcript 364:16 – 365:22. Mr. Pinson admitted that he currently works

with the individual brokering the sale, and that he could possibly receive an ownership interest in

the transaction.  Transcript 297:9 – 298:23.  He reiterated that Sabbatical's assets would make the

sale "more attractive."  Transcript 300:4 – 15.  That sale may not pay all of Sabbatical's creditors,

though. It may only cover the secured debt owed to Arch Coal.  Transcript 373:10 – 374:4.

The Court also notes that Sabbatical's unsecured creditors[4] consent to dismissal,[5] but, at the time of the November 2016 hearing, Arch Coal, which has a claim of approximately $6 million, refused to take a position on any of the motions before the Court.[6]

The Court additionally notes that Mr. Fluharty supports the appointment of a Chapter 11 Trustee over Sabbatical. He testified at the November 2016 hearing that it is important to keep Sabbatical in Chapter 11 and have a Trustee appointed because creditors "would be benefited by a liquidation [of the debtor]." Transcript 369:20 - 370:10. The Court also understands the context in which Mr. Fluharty testified – having only been appointed Trustee over the coal enterprise entities for nine days and having not had a chance to fully familiarize himself with Sabbatical's affairs. Transcript 348:15 – 23. However, Mr. Fluharty is a seasoned and well-regarded Trustee and his opinion and testimony are entitled to due weight. Transcript 344:9 – 20 (Mr. Fluharty explaining that he has been a state court and federal court receiver previously, and has been a special commissioner in a variety of fiduciary capacities).

## II.

### A.  Governing Standard

The United States Trustee requests appointment of a Chapter 11 Trustee under 11 U.S.C. § 1104(a)(1) and (2). The statute provides, in pertinent part, as follows:

---

[4] The amounts of these unsecured claims range from $37.05 to $14,000. Transcript 54:24.

[5] The Court received into evidence on November 16, 2016, verified consents to dismissal from all unsecured creditors, except for American Coal Terminal, which is an insider.

[6] Arch Coal since filed an affidavit consenting to dismissal of the Sabbatical, Inc. bankruptcy case (docket no. 127). People's Bank objects to that affidavit (doc. 128). The Court will not consider the affidavit in its decision due to the timing of the filing, the lack of any background information, indicia of reliability, or authentication.

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) and (2).

In summary, the provision dictates the Court *shall* order the appointment of a trustee either for cause, under subsection (1), or if the appointment is in the interests of the creditors, any equity security holders, and other interests of the estate, under subsection (2). *Id. But see In re Maxway Corp.*, 27 F.3d 980, 984 (4th Cir. 1994) (noting, "[A] trustee may be appointed in a Chapter 11 reorganization for cause at any time . . . ."). Inasmuch as the appointment of a trustee in a Chapter 11 case is an "extraordinary remedy," some courts hold that the party moving for the appointment must show that it is warranted by clear and convincing evidence. *Prologo v. Flagstar Bank, FSB (In re Prologo)*, 471 B.R. 115 (D. Md. 2012) (citing *In re Bayou Group, LLC*, 564 F.3d 541 (2d Cir. 2009); *In re G-I Holdings, Inc.*, 385 F.3d 313 (3d Cir. 2004). *But see In re Byrd*, No. 04-35620, 2007 Bankr. LEXIS 4162 (Bankr. D. Md. Dec. 5, 2007) (Noting that the clear and convincing standard "appears to be stricter than the Fourth Circuit's approach."). Importantly, "there is[, at a minimum,] a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *In re Heck's Props., Inc.*, 151 B.R. 739, 756 (S.D. W. Va. 1992) (Copenhaver, J.) (citing *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239 (4th Cir. 1987)).

12

"Cause," under section 1104(a)(1), includes dishonesty (either before or after the filing of the petition), gross mismanagement, incompetence, and fraud. *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 242 (4th Cir. 1987); *see also Fraidin v. Weitzman (In re Fraidin)*, No. 9401658, 1994 U.S. App. LEXIS 34615 (4th Cir. Dec. 9, 1994). It is "implicit in a finding of incompetence, dishonesty, etc., for purposes of section 1104(a)(1), [that] the conduct shown rises to a level sufficient to warrant the appointment of a trustee." *A.H. Robins Co.*, 828 F.2d at 242. Any determination of "cause" is fact-intensive and soundly within the discretion of the bankruptcy court. *Id.* In addition to the list contained in section 1104(a)(1), courts have also looked to whether there is "substantial doubt [about whether] the Debtor's current management can be considered loyal to its goal of rehabilitation" *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981) and whether there is "a history of transactions with companies affiliated with the debtor." *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) (citing five other similar decisions).

One court listed several factors, including "conflicts of interest, . . . inappropriate relationships between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting . . . various instances of conduct found to establish fraud or dishonesty; failure to make required payments; and lack of credibility and creditor confidence." *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Penn. 1988).

The following additional examples also aid the analysis. Our court of appeals agreed with the lower court in *Committee of Dalkon Shield Claimants v. A.H. Robins Co.* that "cause" was not shown where the Debtor, in violation of a court order and without prior approval from the court, paid certain pre-petition claims. *A.H. Robins Co.*, 828 F.2d at 241-42. The court of appeals reached that conclusion after "examin[ing] the entire situation, including the

13

consequences of appointing a trustee," and determined that, although the Debtor's actions were "improper and warranted a civil contempt sanction," they did not rise to the level of "cause" under section 1104(a)(1).  *Id.*

In a situation where a debtor's principal leased some collateral of Bank of America without authorization, and collected the rents for his personal use, and where the debtor additionally failed to keep collateral insured, pay property taxes, comply with a court order to turn over funds, to pay quarterly fees to the U.S. Trustee, and file monthly operating reports, the court found that there was cause to appoint a Chapter 11 Trustee.  *In re TP, Inc.*, 455 B.R. 455, 457-59 (Bankr. E.D.N.C. 2011).

In *In re Ricco, Inc.*, my colleague in the Northern District appointed a Chapter 11 Trustee arising out of the "incompetence and gross mismanagement" of the debtor.  *In re Ricco, Inc.*, Nos. 3:10-bk-00023; 3:10-bk-00033, 2010 Bankr. LEXIS 1916, (Bankr. N.D. W. Va. June 28, 2010).  The findings of "incompetence and gross mismanagement" stemmed from evidence that tax returns were not filed for five years, that income from the business was used to pay the expenses of the sole shareholder and president of the debtor, that the debtor maintained no recognizable form of accounting, and that the president was "incompetent to continue any further business dealings on behalf of Ricco."  *Id.* at *12-14.  Importantly, the Court noted that the pre-petition mismanagement continued after filing.  *Id.*

A Chapter 11 Trustee was also appointed in a case where the "loyalty of [the Debtor's president] to the Debtor's rehabilitation [was] substantially called into question by his many competing business interests and the potential for inter-company dealing which favor[ed] those he own[ed] outright."  *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981) (Flowers, J.).  In the *Concord Coal* case, the debtor's President owned an interest in several

14

other companies which had a "record of inter-company transactions involving extension of credit and transfer of assets which have spawned charges of dishonest dealing." *Id.* Judge Flowers found that to successfully rehabilitate, "borrowing appear[ed] mandatory" and that, because of the President, it was "highly improbable that the Debtor [could] gain and maintain the confidence of secured creditors and lenders in sufficient measure to support rehabilitation." *Id.*

In contrast, section 1104(a)(2) calls for the appointment of a trustee when it is in the interests of the creditors. 11 U.S.C. § 1104(a)(2). Courts have found that this section must be "read in the conjunctive," such that the interests of the equity security holders *as well* as the creditors must be benefited. *In re LHC, LLC*, 497 B.R. 281, 309-10 (Bankr. N.D. Ill. 2013). This often results in a cost-benefit analysis, in which courts evaluate factors such as: (1) the trustworthiness of the debtor's management; (2) the debtor's historical performance and prospects for rehabilitation; and (3) whether public and creditor confidence in the debtor's management has been eroded. *Id.* at 293.

Some specific situations in which trustees have been appointed under section 1104(a)(2) include: where all aspects of the debtor's management were marked by conflict, acrimony and animosity, and the absence of meaningful progress towards a plan (*Taub v. Taub (In re Taub)*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010)), where there was "deep-seeded  conflict and animosity" between the debtor and its creditors (*In re Marvel Entertainment Group*, 140 F.3d 463, 474 (3d Cir. 1998)), and where there was a loss of confidence by the creditors -- especially when "a debtor's failure to move a case forward in the direction of a successful reorganization has caused the creditors to lose confidence that reorganization is, in fact, possible with current management at the helm" (*In re Sundale, Ltd.*, 400 B.R. 890, 909-10 (Bankr. S.D. Fla. 2009)). Even though section 1104(a)(2) is known as the "more flexible" standard of the two, courts have held that

"where . . . the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *Petit v. New England Mortgage Servs.*, 182 B.R. 64, 69 (D. Me. 1995) (quoting *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989); *see also In re Drew Transp. Servs.*, No. 16-02609,5-JNC, 2016 Bankr. LEXIS 2514, *25-16 (Bankr. E.D.N.C. July 7, 2016) (Holding that "a debtor has a duty in bankruptcy to be truthful and demonstrate candor in its representations to the court and parties-in-interest . . . In a case involving a chapter 11 debtor-in-possession, parties in interest need reassurance that the debtor-in-possession will operate the business honestly and will investigate and administer assets in accordance with the Code.").

The Court, with the aid of *In re LHC*, first analyzes the factors found applicable to the section 1104(a)(2) inquiry.  In doing so, multiple other factors set forth above, and applicable to both statutory subdivisions, are necessarily subsumed therein.

## B.   Analysis

### 1. Section 1104(a)(2)

### i. The Trustworthiness of Sabbatical's Management

First, Mr. Johnson, the admitted "controller" of Sabbatical, has diminished credibility. His testimony meandered considerably during the November 2016 hearing. Additionally, he has offered conflicting statements and contributed markedly to the opacity surrounding many of the intercompany transfers.  The Court encountered great difficulty in its examination of Mr. Johnson's answers from the hearing regarding the transfers and issues of equipment location.  It is Mr. Johnson's very inability to concisely and clearly explain the source and disposition of funds and machinery that gives rise to trustworthiness concerns.

Mr. Johnson attempts to blunt the significance of the intercompany transfers of both funds and equipment by asserting unspecified, proper accounting for each. For example, a portion of more than a million dollar transfer was executed post-petition and without Court authorization. The transfer followed a circuitous path through the coal enterprise, stopping at Mr. Johnson's personal account along the way, and affecting not only Sabbatical but six other coal enterprise companies as well. Further, a coal sale of more than $600,000 was consummated through Sabbatical post-petition and was not mentioned on any operating reports or in any filings. Also, multiple pieces of valuable equipment which serve as collateral on at least one loan have been moved around so frequently that the coal enterprise employees were not entirely familiar with the assets' locations. Some coal enterprise equipment even found its way to Mr. Johnson's personal residence.

Mr. Johnson attempts to defend the intercompany transfers, asserting that at the time many occurred, around June of 2015, he believed that the value of the coal enterprise was approximately $60 to $70 million (Transcript 163:22 – 164:1), and the liabilities were between $30 and $32 million. Transcript 161:19 – 24. Thus, Mr. Johnson claims to have been operating under the errant assumption that the coal enterprise was not underwater. Transcript 161:12 – 18. But Mr. Johnson also testified that he knew he was "getting killed" at the other docks and that his other coal enterprise companies were struggling,[7] and he sent an email to Mr. Pinson in January of 2015 saying that he knew that he had "creditors closing in on him." Transcript 268:4 – 269:6.

Other examples of Mr. Johnson's contradictory statements include those conflicting accounts from the November 2016 hearing in this matter and those assertions made in the state

---

[7] This was corroborated by an email sent from Mr. Johnson to Mr. Pinson in March 2015 explaining that "things were so ugly," and that Mr. Johnson knew he was having financial difficulty. Transcript 269:21 – 271:1.

court receivership proceedings.  For example, when asked in April 2016 in state court whether he would unwind the transfer of his interest in Sabbatical, he said he would do so if requested by People's Bank.  Transcript 65:2-8.  However, when asked if he would do so in the November 2016 bankruptcy court hearing, Mr. Johnson opined that he did not have the power to make that decision, even though Denise Johnson, his wife, would approve of such a transfer.  Transcript, 61:10-16, 206:13-18.

The Court is unconvinced that Mr. Johnson and Sabbatical will fulfill the duty of candor. Mr. Johnson has failed to rebut the clear and convincing evidence of record that gives rise to serious doubts concerning whether he will scrupulously administer the business in compliance with the Code.  For these reasons, this factor weighs in favor of appointment of a Trustee.

### ii. Sabbatical's Historical Performance and Prospects for Rehabilitation

Mr. Johnson explained that Sabbatical is performing well and has an excellent chance of success outside of bankruptcy.  The monthly operating reports, however, disclose negative net income during May, July, September, and December of 2016.  During October and November 2016, Sabbatical's profit was lower than projected.  Staff has been reduced, with one monthly operating report showing a switch from fourteen to eleven employees.  Mr. Johnson claims that Sabbatical was making its payments as they came due, but he has also testified to the numerous "loans" and cash infused into Sabbatical to, at times, meet payroll.  Thus, the Court is unable to conclude that Sabbatical has its best chance outside of bankruptcy.  A finding to the contrary is clearly warranted.

Also of concern is that Mr. Johnson has been "permit blocked" by the Kentucky Department for Natural Resources.  People's Bank Objection to Affidavit of Arch Coal, Inc.,

Docket no. 128, para. 13.  Thus, no companies with Mr. Johnson listed as a corporate officer or responsible person (this description includes Sabbatical) may renew or obtain permits.  *Id.* at para. 14. Sabbatical's permit expires in March 2017 and cannot be renewed with Mr. Johnson continuing as its corporate officer and responsible person.  *Id.*

The Court acknowledges that it will be difficult for Sabbatical to negotiate new contracts while in bankruptcy; Sabbatical retains though the agreement with Carbon Partners.  Considering the potential profit from the first refusal contract Carbon Partners has with Southern Marine Terminal, it is easy to deduce that Sabbatical's partnership with Carbon Partners will be similarly lucrative.  It is clear Sabbatical's bankruptcy will not cause it to lose significant profits.

### iii.  Public and Creditor Confidence in Sabbatical

People's Bank is a suitable subject from which to judge public confidence in Sabbatical.  People's Bank is one of the largest creditors in the other coal enterprise cases.  Its concern about the coal enterprise and Sabbatical is best displayed by the filing of its own Motion to Appoint a Chapter 11 Trustee in this matter.

One readily gleans from the evidentiary record that Sabbatical will need loans to sustain operations.  Mr. Johnson cannot continue to fund the business from his personal account or from the other coal enterprise companies that are currently in bankruptcy.  The Court is uncertain that lenders will eagerly transact with Mr. Johnson, especially given the frequency with which collateral is sold within the companies and physically relocated to different sites.  Additionally, if Mr. Johnson was permitted to accomplish sales and transfers using Sabbatical, without Court approval but while in bankruptcy, chaos will follow.  This factor thus weighs strongly in favor of the Trustee appointment.

iv.     **Best Interests of Sabbatical's Creditors, Equity Interest Holders,
and Other Interests of the Estate**

It seems apparent that Mr. Johnson has used Sabbatical to the detriment of his other coal enterprise companies.  While he asserts the entity is entirely separate and distinct from the rest of the coal enterprises, the record indicates otherwise.  Illustratively, Sabbatical has received funds from Producers Coal, Moussie, and from Mr. Johnson.  Additionally, it uses equipment owned by Redbud Dock.

Sabbatical and the Lockwood Dock rely on monetary transfers from Mr. Johnson and the other coal enterprises, along with the use of equipment owned by other companies, such as Redbud Dock.  It is thus in the best interests of Sabbatical to continue operating with the other coal enterprise entities and to be administered by the same Trustee handling those cases.

Moreover, because of the intercompany transfers, Mr. Johnson has ensured that the fate of the other coal enterprise companies is tied inextricably with that of Sabbatical.  Following ineluctably from his testimony that transfers were common and that money went wherever needed is the unremarkable assumption that Sabbatical almost certainly owes money to the other coal enterprise companies and they owe money to it.  The best interests of the coal enterprise companies thus clearly align with those of Sabbatical and vice versa.  Thus, the interests of the coal enterprise must be balanced against those of Sabbatical's listed creditors – most of which have claims of less than $14,000 and one of which is an insider.

The equity interest holder in Sabbatical is the Denise Johnson Trust and, arguably, the Johnson children who will benefit therefrom.  The more money that Sabbatical makes the more the children will receive.  But any benefit to the children from the Trust is surely years away.  There is no guarantee that Sabbatical, if left without a Trustee, will continue to make money or be

profitable, especially since Mr. Johnson has been permit blocked.  The same is true for Sabbatical's

actual creditors.  Mr. Johnson claims he was able to pay his debts as they came due prior to filing,

but the monthly operating reports show fewer profits than expected and some months with negative

cash flow.  There is no guarantee, or even likelihood, that Sabbatical will be more profitable

without a Chapter 11 Trustee.  Considering that, along with the interests of the other coal enterprise

companies, the jobs they create, the viability of a global enterprise sale, and the necessity of

Sabbatical to the entire operation outweighs some potential future benefit to the Johnson children.

Thus, this factor weighs in favor of the appointment of a Trustee.

Having considered the factors listed above along with others under section

1104(a)(2), this Court finds and concludes by clear and convincing evidence that appointment of

a Chapter 11 Trustee for Sabbatical is both necessary and proper.[8]

## III.

Inasmuch as the analysis favors appointment of Chapter 11 Trustee under section

1104(a)(2), it is

**ORDERED** that the United States Trustee's Motion to Appoint Chapter 11 Trustee

be, and is hereby, **GRANTED.**  A Chapter 11 Trustee shall be appointed in the Sabbatical, Inc.

Chapter 11 case.

**IT IS FURTHER ORDERED** that this case shall be jointly administered with the

other Dennis Johnson cases, with the lead case captioned at 3:16-bk-30227.

---

[8] Moreover, although it need not address section 1104(a)(1), there is sufficient grounds for
the appointment of a Chapter 11 Trustee thereunder.  Much of the conduct above-described gives
rise to a "cause" finding.

**IT IS FURTHER ORDERED** that Sabbatical, Inc.'s Motion to Voluntarily Dismiss Petition be, and is hereby, **DENIED.**

**IT IS FURTHER ORDERED** that People's Bank's Motion to Appoint Trustee be, and is hereby, **DENIED WITHOUT PREJUDICE AS MOOT**.